IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| DANA R. HAM,<br> Plaintiff,<br><br>vs.<br><br>GEORGIA PUBLIC SAFETY TRAINING<br>CENTER and J. DALE MANN, as Director<br>of Georgia Public Safety Training Center, in his<br>official and individual capacities,<br> Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | 5:08-CV-384 (CAR) |

*ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

  This case follows a quarter million dollar theft of state funds by an employee of Defendant Georgia Public Safety Training Center ("Center"). An outside investigation indicated that more vigilant supervision of the employee would have revealed the theft sooner. The embezzler's sustained criminal enterprise took place entirely during a period of time in which Plaintiff Dana R. Ham was responsible for the employee's supervision. After firing the thief, Defendant J. Dale Mann, the Director of the Center, dismissed Plaintiff for failing to supervise the employee adequately, which Defendants claim prolonged the theft and compounded the monetary damage to the state by preventing the Center from uncovering the crimes sooner. Because her supervisor–Assistant Director Bob Sanderson–and the Director himself were not fired for the same reasons, Plaintiff sues Defendant Mann individually for gender discrimination under 28 U.S.C. § 1983. She also alleges that her dismissal violated O.C.G.A. § 45-1-4 et seq. ("The Whistleblower Act").

  Defendants have moved for summary judgment [Doc. 11]. Plaintiff filed a Response in which she abandoned a third claim for invasion of privacy [Doc. 20]. Defendants replied [Doc. 22], and the Motion is now ripe for review. Because Plaintiff has failed to create any genuine issue of material fact, Summary Judgment is **GRANTED** on the discrimination claim. Plaintiff's remaining state law claim is **DISMISSED** without prejudice to its renewal before an appropriate Georgia court.

## BACKGROUND

Female Plaintiff Dana Ham took an accounting position at the Center in 1986. Pl. Dep. at 9, 15-16. She is a licensed Certified Public Accountant ("CPA") and worked at a private accounting firm for four years after earning her undergraduate degree in accounting from Mercer University in 1982. Id. Plaintiff's initial job responsibilities at the Center included overseeing payables and checking the general ledger. Id. at 19.

Her job duties grew, however, as the Center expanded, and she came to supervise more employees. Pl. Dep. at 20. Two years after she started working for the Center, she was promoted to a management position. Id. at 20. During Plaintiff's last years of employment, she continued to supervise and review some of the accounting work. Id. at 82-83. In addition, her other administrative responsibilities included overseeing grants, supervising subordinates, and assisting with the annual budget and tax return. Id. Plaintiff also annually reviewed balance reports and bank reconciliations to ensure that the cash was reported correctly before submitting the year-end statements to headquarters, although this responsibility was not made explicit in her job description. Id. at Ex. 1; Ham Aff. at ¶ 3.

At the time of the events that led to her dismissal, Plaintiff supervised three people in accounting. Pl. Dep. at 87. Of the three, two are important to these proceedings: Mary Watts and Trudy Rutland. Id. Watts was responsible for supervising the accounting section, assisting Rutland as necessitated by work volume, entering accounting data, and reconciling the bank statements. Id. at 87. Rutland was responsible for billing and invoicing all revenue, receiving and collecting payments, collecting cash from the facility, entering related information onto the local accounting system, managing the checkbook for the memorial fund account, managing the facility's pass through account, and maintaining the vending machines. Id. at 88-89.

When Watts began as accounting supervisor, she did the bank reconciliations herself, but she delegated that duty to Rutland as early as 1999. Pl. Dep. at 94. According to her job description, Watts should have performed the bank reconciliations herself. Abercrombie Dep. at 30-31. Plaintiff learned that Watts was not performing the bank reconciliations. Pl. Dep. at 94. She told Watts several times to do the reconciliations herself. Id. at 94. Plaintiff wrote in Watts's annual performance review one year that Watts needed to resume doing the bank reconciliations, but Watts did not start doing the reconciliations. Id. at 94-95. Plaintiff did not report to anyone thereafter of Watts's continuing refusal to do the bank reconciliations. Id. at 95.

Plaintiff has indicated that she did not feel the previous director would have supported her in any disciplinary action she might have taken against Watts. Id. at 147-148. But Plaintiff never tried to discipline or correct Watts's performance after Defendant Mann became Director. Id. at 147. Plaintiff never even talked to Defendant Mann about the issues with Watts's job performance. Id. at 95.

Male Defendant Mann became Director of the Center in August 2003. Mann Dep. at 8. He does not have any university training in accounting. Id. at 12. When Mann became Director, he combined two positions to create one assistant director position to whom all the divisions, including Plaintiff's, reported directly. Id. at 18-22, 25. The new male Assistant Director, Bob Sanderson, was then responsible for supervising Plaintiff as well as all the other operating divisions and training divisions. Id. at 22. Sanderson has no formal accounting training, and although he was Plaintiff's immediate supervisor, he had no day to day responsibilities for fiscal services. Sanderson Dep. at 5, 9.

In 2006 or 2007, an independent contractor told Mann that there was a revenue shortfall at the Center. Mann Dep. at 29; Guerrerio Dep. at 10, 13. Mann later met with Sanderson and

Plaintiff to inform them of a dramatic and sustained drop in revenue at the Center. Mann Dep. at 32; Sanderson Dep. at 14. Everyone agreed to explore all potential causes of the shortfall. Mann Dep. at 33-35. After the management meeting, Plaintiff and Watts performed the backlogged bank reconciliations they had previously ignored and discovered a trend of missing deposits in substantial amounts. Pl. Dep. at 105.

As early as April 2007, Plaintiff had become concerned that Rutland was behind in her work. Pl. Dep. at 96. Rutland attributed her decreased productivity to trouble at home. Id. at 96. In reality, Rutland had been hard at work placing fraudulent checks in place of cash received on the Center's deposits. Id. at 105-106; Mann Dep. at 35-36. Then, she altered the receipts, so the record would reflect a lower amount, allowing her to pocket the difference. Id. Rutland's employment was terminated. Mann Dep. at 36.

The Georgia Bureau of Investigation ("GBI") investigated the missing cash and altered deposit receipts in August 2007. Pl. Dep. at 108; Mann Dep. at 35. In addition, the Georgia Department of Audits and Accounts ("Department of Audits") reviewed the facility's financial records from July 2002 through August 2007. Abercrombie Dep. at 18-19; Mann Dep. at 37. Six weeks later, the Department of Audits prepared a final report that explained the theft, how it occurred, and the amount missing. Mann Dep. at 40; Abercrombie Dep. Ex. 1. Approximately $241,000 was missing, and Rutland was arrested in connection with the theft. Mann Dep. at 40; Pl. Dep. at Ex. 2.

Plaintiff indicates that since Rutland was actually making the deposits, there was nothing "on the surface" to indicate a problem. Pl. Dep. at 113. Plaintiff admits, however, that she would have caught the thefts during their fourth year had she followed her normal procedure of reviewing the year-end reconciliation. Id. at 114. In her defense, she notes that she was busy that

4

year implementing a new accounting software program at the Center and points to the fact that no one else caught the discrepancies at that time. Id. Plaintiff further believes someone on the Center's administrative staff should have informed her, as they had in the past, that Rutland was not sending in bank statements. Id. at 68, 114-116.

After receiving the audit, Defendant Mann felt that only a lack of supervision at the Center could have permitted the nearly quarter million dollar theft to take place over the course of four years. Mann Dep. at 41. Defendant Mann claims that he attributed this lack of supervision over the Center's revenue stream to both Watts, who was Rutland's direct supervisor, and Plaintiff, who was Watts's direct supervisor. Id. at 41. Defendant Mann also expressed concern that Plaintiff, whom he knew to be a CPA, had let the bank reconciliations go undone for two years, even though Sanderson had given Plaintiff a satisfactory performance review after the theft. Id. at 47; Sanderson Dep. at Ex. 1.2. He dismissed Plaintiff and Watts on October 12, 2007. Pl. Dep. at 122; Ex. 5. Plaintiff was replaced by female Cindy Franklin. Mann Dep. at 22-23.

Defendant Mann has testified that he did not feel Sanderson was directly involved with the bank reconciliations or daily deposits, so he saw no need to terminate his employment. Mann Dep. at 49. As a result of the theft, however, Defendant Mann did revisit his earlier decision to combine the two Deputy Director positions into one. He "became convinced" that the position of assistant director "was more job than any one person could probably do as effectively as I wanted it." Id. at 28. He replaced the single assistant director with two deputy directors, which had been the original management structure. Id. at 27-28. The theft, which directly precipitated the move to restructure management, thus effectively resulted in a demotion for Sanderson.

## STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). The substantive law applicable to the case determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See id. at 247-48. Thus, summary judgment may be granted if there is insufficient evidence for a reasonable jury to find for the nonmoving party or, in other words, if reasonable minds could not differ on the verdict. See Id. at 249-52.

In reviewing a motion for summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the Court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The movant carries the initial burden and must show the court that "an absence of evidence to support the nonmoving party's case" exists to sustain its motion. Celotex, 477 U.S. at 325. "Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The nonmoving party must then go beyond the pleadings and present specific evidence that raises a genuine issue of material fact (i.e., evidence that would support jury verdict), or

otherwise show that the moving party is not entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than conclusory allegations or legal conclusions and may include affidavits, depositions, and admissions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). "Mere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment." Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005). Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof." Celotex, 477 U.S. at 323.

In the employment discrimination context, unverifiable conjecture, unsupported opinions, and unsubstantiated allegations of coworkers cannot suffice as viable summary judgment evidence, especially where contradictory of highly credible and authenticated record evidence. See Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 658-59 (11th Cir. 1998) (rejecting plaintiff's unverifiable, anecdotal testimony about alleged comparators); Combs v. Plantation Patterns, 106 F.3d 1519, 1532 (11th Cir. 1997) (requiring plaintiff to introduce sufficient testimony to allow fact finder to disbelieve each of employer's proffered explanations to survive summary judgment). A district court does not need to "review all of the evidentiary materials on file," *sua sponte*, however, it "must ensure that the motion itself is supported by evidentiary materials" and, at the least, "must review all of the evidentiary materials submitted in support of the motion for summary judgment." 5800 SW 74th Ave. 363 F.3d at 1101-1102.

**DISCUSSION**

I. Gender Discrimination Claim

    a. Proposed comparators not similarly situated

Where, as here, there is no direct evidence of discrimination, a plaintiff may prove discrimination through circumstantial evidence, using the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). A plaintiff can establish a prima facie case of gender discrimination by showing that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) her employer treated similarly situated male employees more favorably, and (4) she was qualified for the job. Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir.1997). The elements of a gender discrimination claim pursuant to 42 U.S.C. § 1983 are the same as the elements of a Title VII disparate treatment action. Rice-Lamar v. City of Ft. Lauderdale, Fla, 232 F.3d 836, 843 (11th Cir. 2000).

Plaintiff offers Defendant Mann and Sanderson as proposed comparators. She claims that since Defendant Mann, as Director, and Sanderson, as Assistant Director, were also ultimately responsible for Rutland's supervision, they fared better than Plaintiff. The different supervisory responsibilities that accompany these respective positions at the Center, however, insulate Defendant Mann and Sanderson from functioning as similarly situated comparators to Plaintiff–not the variance in title alone. The finding by the Department of Audits that Plaintiff had not supervised Rutland adequately provided Defendant Mann a reasonable basis for his determination that Plaintiff bore this responsibility while he and Sanderson did not. Thus, Defendant Mann did not arbitrarily punish Plaintiff more severely than the proposed

comparators even if all three were subject to the same employment policy.

Defendant Mann has put indisputable evidence into the record that neither he nor proposed comparator Sanderson 1) occupied the same position in the chain of supervision as Plaintiff, 2) were as close to the events that led up to the theft as Plaintiff, 3) were responsible for the day-to-day accounting functions at the Center, 4) had any formal accounting training or experience, 5) knew of Watts's delegation of her responsibility for performing bank reconciliations to Rutland, or 6) were ever told of Rutland's repeated failure to complete this task, which proved so critical as a quality control mechanism in the Center's accounting function.

Plaintiff, on the other hand, occupied a position that involved the direct supervision of Watts and, in turn, Rutland. She was thus more closely involved with the day-to-day activities of Rutland than either Defendant Mann, who serves as the executive director of the entire Center, or Sanderson, who similarly performed predominately in a management capacity as the only assistant director immediately under Defendant Mann. In addition, Plaintiff had earned a degree in accounting, worked as a CPA, begun at the Center in accounting, and continued to supervise certain accounting functions until her departure. She therefore had an intimate knowledge of not only the accounting procedures at the Center but also should have been quite aware of the best practices in the field. Finally, Plaintiff had specific information that indicated Watts and Rutland were not carrying out their responsibilities with respect to the bank reconciliations. She did not convey this information to either Defendant Mann or Sanderson. With the possible exception of a single comment buried in an annual evaluation form, she took

no proactive measures to discipline Rutland and Watts or to put the issue directly before Defendant Mann or Sanderson.

All of these differences in the respective job responsibilities, professional experience, and firsthand knowledge of Plaintiff, Defendant Mann, and Sanderson bear on the assessment of any breakdown in the supervision of Rutland as an employee at the Center. The Eleventh Circuit has set a high standard that "require[s] that the quality and quantity of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). As such, Defendant Mann and Sanderson cannot function as similarly situated comparators to Plaintiff for purposes of a sex discrimination claim. Since there is no direct evidence of sex discrimination, Plaintiff's claim fails as a matter law.

b. Nondiscriminatory reason that was not pretextual

Defendant Mann, moreover, has shown that Plaintiff's position was eliminated for a legitimate business reason. If a plaintiff makes out a prima facie case, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action in order to succeed on summary judgment. Meeks v. Computer Associates Intern., 15 F.3d 1013, 1019 (11th Cir. 1994). This burden is low and may be satisfied through the introduction of admissible evidence that demonstrates non-sex based reasons for the defendant's actions. Id. A defendant who carries this burden of production successfully rebuts the presumption raised by the prima facie case. Rice-Lamar, 232 F.3d at 843. To survive summary judgment, the plaintiff must then

10

demonstrate that the proffered reason was not the true reason for the adverse employment action. Id. A plaintiff shows such pretext either by persuading the court to a preponderance that discriminatory intent motivated the employers actions or by discrediting the employer's proffered explanation. Id.

Plaintiff has neither shown discriminatory intent nor discredited Defendant Mann's proffered explanation for her dismissal. Following Rutland's theft of over $240,000.00, Defendant Mann fired Rutland and two of her two most immediate supervisors, Plaintiff and Watts. Plaintiff was replaced by a female. The decision to fire Plaintiff thus required Defendant Mann to rely on his best business judgment regarding who in the Center's chain of supervision bore responsibility for allowing Rutland's theft to go unnoticed. The investigative finding by the Department of Audits that Plaintiff had not supervised Rutland adequately provided Defendant Mann a legitimate nondiscriminatory basis to fire Plaintiff under these circumstances.

Plaintiff has not met her burden of production to show that this reason was a pretext for unlawful discrimination. She has not submitted sufficient evidence that Defendant Mann's proffered reason for firing Plaintiff is implausible. Plaintiff first points to the fact that Defendant Mann stated that Sanderson was not "involved to the point that he oversaw bank reconciliation" before demoting Sanderson to Deputy Director. Next, Plaintiff argues pretext from the fact that Defendant Mann did not object to Sanderson's satisfactory job performance rating of Plaintiff for the year prior to her dismissal. Finally, Plaintiff suggests that Defendant Mann's basis for terminating her position rested on a finding of inadequate supervision over the Center's revenue stream when, in fact, the theft revolved around missing deposits.

11

These strained "inconsistencies" do not suggest pretext; rather, they are the result of discretionary judgment decisions any manager must make every day. Federal courts cannot simply second-guess the reasonable business judgments of employers. Combs, 106 F.3d at 1543. "Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer." Id. As such, Plaintiff has failed to create a genuine issue of material fact on the sex discrimination claim.

c. Qualified immunity established because no constitutional violation occurred

In addition, Defendant Mann has asserted qualified immunity as a defense to the sex discrimination claim, which Plaintiff has only alleged against him in his individual capacity. Qualified immunity provides complete protection for government officials sued in their individual capacities as long as their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The purpose of this immunity is to allow government officials to carry out their discretionary duties without fear of personal liability or harassing litigation. See Anderson v. Creighton, 483 U.S. 635, 638 (1987).

An affirmative defense to suit, qualified immunity may be pled at various stages in a case, including in a pretrial motion to dismiss, as an affirmative defense in the request for judgment on the pleadings, on summary judgment, or at trial. Skrtich v. Thornton, 280 F.3d

1295, 1306 (11th Cir. 2002). In analyzing qualified immunity on summary judgment, the Court must resolve all issues of material fact in favor of Plaintiff, and answer the legal question of whether the defendant is entitled to qualified immunity under that version of the facts. Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002). The facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case, Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000). The Court's analysis must nonetheless begin with a description of the facts in the light most favorable to the plaintiff, Skrtich, 280 F.3d at 1299.

For qualified immunity to attach, a public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Courson v. McMillan, 939 F.2d 1479, 1487 (11th Cir. 1991). That Defendant Mann acted within the scope of his discretionary authority as Director of the Center in firing Plaintiff is undisputed. Once a defendant establishes that he was acting within this authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. Courson, 939 F.2d at 1487.

The Supreme Court has set forth a two-part test for evaluating a claim of qualified immunity. The facts alleged must show that the government official's conduct violated a constitutional right, and the constitutional right in question must have been clearly established at the time of the violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). When a court conducts this analysis, however, it may reverse the order of inquiry and consider either issue first. Pearson v. Callahan, — U.S. —, 129 S.Ct. 808, 172 L. Ed 2d 565 (2009).

13

Since the facts, as alleged by Plaintiff, fail to make out a prima facie case of sex discrimination, she can show no constitutional violation. As such, qualified immunity is an alternative ground for barring her sex discrimination claim against Defendant Mann in his individual capacity. Although the analysis differs somewhat, many of the arguments from the previous section remain applicable.

For example, Plaintiff has failed to make the necessary showing for a sex discrimination claim that Defendant Mann intended to treat her differently because she is female. Thus, Defendant Mann's actions did not violate the constitution as required to avoid qualified immunity. The proposed comparators are not similarly situated, so the circumstantial showing fails as well. This finding is also highly pertinent to the notice inquiry in the qualified immunity context.

To deny qualified immunity in this context would substantially limit the doctrine's ability to protect government officials exercising the very kind of discretionary authority that gave rise to the immunity in the first place. To determine who should be culpable for the failed supervision of Rutland would require the Court to second-guess the judgment of government managers in making employment decisions. Such an intrusion of the law would risk transforming every management decision involving a male and female government official into a sex discrimination claim. As a result, government managers would make few discretionary employment decisions without fear of subjecting themselves to personal liability or harassing litigation–a drafty hole, indeed, in the shelter of qualified immunity. Nonetheless, the Court considers for the sake of completeness the second aspect of qualified immunity analysis and concludes that sex discrimination of the sort alleged by Plaintiff is clearly established law.

d. Clearly established law

The Eleventh Circuit follows a wholly objective standard in determining entitlement to qualified immunity. Skrtich, 280 F.3d at 1303; Wood v. City of Lakeland, Fl., 203 F.3d 1288, 1291 (11th Cir. 2000). Whether the constitutional right in question is clearly established must be analyzed in light of the specific context of the case, not as a broad or generalized legal proposition. Id.; Marsh v. Butler County, 268 F.3d 1014, 1031-33 (11th Cir. 2001) (en banc); see also Wood, 203 F.3d at 1291 (holding that general rules, propositions, or abstractions, such as acting with probable cause, do not determine qualified immunity).

Government officials are protected unless the law pre-existing the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the official was doing would be clearly unlawful given the circumstances. Lassiter, 28 F.3d at 1149-50. Government officials sued in their individual capacities are generally entitled to qualified immunity unless a factually similar or controlling case has clearly established that the conduct is impermissible. The pre-existing law must give real notice of practical value to the official, taking into consideration any unique factual circumstances, and not simply rely on an abstract intellectual concept or generalized legal proposition. Pace v. Capobianco, 283 F.3d. 1275, 1282-84 (11th Cir. 2002) (holding that public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases).

The critical inquiry in determining whether law is "clearly established" is whether the defendants had "fair warning" that their conduct was unlawful. Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002). Fair and clear notice can be established in three ways. First, and

15

most often, a high degree of prior factual particularity is necessary to provide sufficient warning that the conduct in dispute was unlawful. Id. at 1350-52. Second, case law announcing general principles of law that are not tied to particularized facts may provide sufficient notice that certain conduct under a different set of facts is illegal. Id. This second form of notice obtains when there is obvious clarity in the law to the point that every reasonable government official would know that the conduct in question violated federal law. Id. Third, a federal statute or constitutional provision may be so clear–and the challenged conduct so bad–that case law is unnecessary to put someone on notice that the conduct is unlawful. Id. Thus, only in extreme cases can government officials be deprived of qualified immunity in the absence of case law. Id.

Plaintiff has failed to present any cases that show Defendant violated her clearly established equal protection rights by firing her and not others. In fact, Plaintiff has cited no case with similar facts that could have served to put Defendant Mann on notice. Nor has the Court found precedent precisely on point from the Supreme Court, Eleventh Circuit, or Georgia Supreme Court.

The closest case the Court has located involved a female employee at the Georgia Department of Juvenile Justice who alleged sex discrimination after she was fired for violating a rule that prohibited fraternization with minor clients. Lathem v. Department of Children & Youth Servs., 172 F.3d 786 (11th Cir. 1999). She allowed a juvenile client to stay at her home on Christmas Eve while he looked for permanent housing. Id. at 789. She produced evidence, however, that a male employee had not been fired or even officially investigated following allegations that he engaged in an inappropriate relationship with a fifteen-year-old female client. Id. at 790. The Eleventh Circuit concluded that the two employees could function as similarly

situated comparators even though they had different titles because both were subject to the same employment policy and violated the same work rule. Id. at 793.

The holding in Lathem, however, only extends so far. A difference in title may be relevant on the issue of whether two proposed comparators are similarly situated. In many cases, the distinction is dispositive. See Rioux v. City of Atlanta, 520 F.3d 1269, 1281 (11th Cir. 2008) (holding that two public employees of different ranks were not similarly situated in race discrimination claim where divergent job responsibilities beyond title alone prevented appropriate comparison).

The fact scenario presented in this case is distinguishable from Lathem. Plaintiff's dismissal did not involve a work rule violation; rather, Defendant Mann fired Plaintiff for a general failure in carrying out her supervisory responsibilities. Additionally, the proposed comparator in Lathem faced allegations of more serious conduct than that of the terminated employee. Plaintiff, on the other hand, cannot dispute that she was more directly responsible for Rutland's supervision than either Sanderson or Defendant Mann based simply on her position in the Center's management hierarchy. Unlike the Lathem comparator, Sanderson, moreover, did face employment consequences as a result of the Rutland affair. Defendant Mann divested Sanderson of half of his supervisory responsibilities and effectively demoted him from Assistant Director to Deputy Director. In this sort of employment decision, "rank clearly matters," because the actual basis for the adverse employment decision stems from the close proximity of one employee to another in the management structure. See Rioux, 520 F.3d at 1281. As such, nothing in Lathem would have put Defendant Mann on notice that his actions could even arguably have violated Plaintiff's constitutional right to be from sex discrimination.

A reasonable government official, therefore, would not necessarily be on notice under these circumstances that his actions might violate clearly established rights based solely on a review of available case law. The Court thus turns to the other two methods by which the preexisting law can clearly establish a plaintiff's federal rights. Although nothing in the facts particular to this case could have put Defendant Mann on notice that his actions were unconstitutional, there is obvious clarity in this area of the law to the point that every reasonable government official would know that firing Plaintiff on the basis of sex would violate her federal rights.

The Eleventh Circuit has long accepted that the equal protection clause covers the right to be free from intentional sex discrimination in public employment as a general proposition. Cross v. Ala. Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing Davis v. Passman, 442 U.S. 228, 235 (1979)); see also Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1272 (11th Cir. 2003) ("In light of our precedent . . . it was clearly established . . . that it was unlawful for a public official to make a race- or gender-based decision concerning hiring, termination, promotion, or transfer to or from an existing position . . . ."). As such, Defendant Mann could have been expected to be on notice without case law on point even though Plaintiff has put no direct evidence of discrimination in the record and, at best, has alleged a circumstantial case. Defendant Mann, therefore, cannot rely on qualified immunity in this regard.

II. The Whistleblower Act Claim

Having determined the only federal question at issue, the Court declines to exercise supplemental jurisdiction over the remaining state law claim. See 28 U.S.C. § 1367(c)(3). Although Plaintiff's novel theory under Georgia's Whistleblower Act appears counterintuitive on its face, the Georgia courts are in the best position to adjudicate this issue. Even had this Court retained subject matter jurisdiction by allowing the federal claim to proceed, it could have refused to hear the state law claim because "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). As such, the remaining state law claim is dismissed without prejudice to its proper renewal in a state court.

**CONCLUSION**

For the reasons explained above, Defendants' Motion for Summary Judgment is **GRANTED** on the discrimination claim. Plaintiff's remaining state law claim is **DISMISSED** without prejudice to its renewal before an appropriate Georgia court.

**SO ORDERED,** this 30th day of September, 2010.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

THC/chw